UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         -against-<br><br>JAIME ROSARIO, JR.,<br><br>              Defendant. | 19 CR 807 (LAP)<br><br>OPINION AND ORDER |

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court is Jamie Rosario's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. no. 213 ("Mot.")). The Government opposed the motion, (dkt. no. 215 ("Opp."), and Defendant replied, (dkt. no. 220). For the reasons set forth below, the motion is denied.

I. Background

    A.  The Offense Conduct

    On the evening of June 19, 2019, at approximately 9:00 p.m., twenty-nine-year-old Rachel Spiteri left a work party at the Lucky Strike bowling alley in Times Square and made her way home to her Midtown East apartment. (See Opp. at 1.) At approximately the same time, Spiteri began a text message conversation with Jeanluc Joiles, her drug dealer. (Id.) In these messages, Spiteri sought to purchase "[t]wo Oxy 30s," that is, two 30 milligram pills of

1

oxycodone.[1] (Dkt. no. 182, Final Presentence Investigation Report, dated April 4, 2022 ("PSR") ¶ 18.) At approximately 10:10 p.m., Joiles arrived at Spiteri's building. (Id.)  Spiteri met Joiles at his car, and Joiles sold Spiteri two pills that he represented to be Oxy 30s. (Opp. at 1.)  Spiteri and Joiles hugged, and Spiteri returned to her apartment. She was not seen alive again.  (Id.)

The next morning, June 20, 2019, Spiteri did not show up at work. (Id.) Spiteri had never missed work before, and her co-workers were concerned; they contacted her mother, who alerted Spiteri's building superintendent. (Id.) At approximately 11:40 that morning, New York City Police Department  ("NYPD") officers found Spiteri dead, facedown in her bed. (PSR ¶ 15.) A nearby $20 bill—an apparent device to snort narcotics—carried blue residue that later tested positive for the presence of fentanyl. (Id.) Her toxicology screen confirmed that she had ingested fentanyl and acetylfentanyl, and her death certificate states that her death was caused by the "Acute Intoxication By the Combined Effects of Fentanyl and Acetylfentanyl." (Id. ¶ 16.) The "Oxy 30s" Joiles sold her did not contain oxycodone—they were counterfeit and

---

[1] 30 milligram oxycodone pills constitute the highest concentration of oxycodone pills generally available on the market, and, as a result, they are commonly sought by individuals suffering from opioid addictions and have a high street value. (See Opp. at 1 n.1.)

2

contained far more potent and deadly synthetic opioids, fentanyl and acetylfentanyl.  (Opp. at 2.)

Following Spiteri's death, the NYPD obtained access to her cellular phone and sent a text message to Joiles, claiming that Spiteri's friend wished to purchase narcotics from Joiles. (PSR ¶ 19.) An undercover officer ("UC") thereafter began communicating directly with Joiles, impersonating Spiteri's friend and attempting to buy drugs. (Id.) Over the course of several meetings, the UC purchased a variety of narcotics from Joiles. (Id. ¶¶ 20-22.) On at least two occasions, the UC purchased what Joiles represented to be Oxy 30s but were in fact counterfeit pills containing fentanyl. (Id. ¶¶ 20-21.) The UC told Joiles that the UC wished to purchase cocaine, and, on July 16, 2019, Joiles invited the UC to Defendant's Astoria apartment. (Id. ¶ 24.) At the apartment, the UC purchased approximately 50 grams of cocaine from Joiles and Defendant. (Id.) The UC obtained Defendant's phone number and also began communicating directly with Defendant and purchasing narcotics from him. (Id.)

Like Joiles, Defendant sold the UC the same fentanyl pills, which Defendant claimed were Oxy 30s. (Id. ¶ 25.) Specifically, on September 4, 2019, the UC purchased fifteen pills from Defendant that he claimed contained oxycodone but were actually fentanyl. (Id.) Both Defendant and Joiles also sold the UC a substance that they claimed was cocaine but was actually methamphetamine. (Id.

3

¶ 27.) On July 31, 2019, Joiles sold the UC methamphetamine that he claimed was cocaine. (Id. ¶ 22.) On October 9, 2019, Defendant similarly sold the UC methamphetamine that he claimed was cocaine. (Id. ¶ 27.)

On October 16, 2019, law enforcement conducted a search of Defendant's Astoria apartment, pursuant to a judicially authorized search warrant. (Id. ¶ 28.) During the course of this search, law enforcement recovered (i) approximately 121 grams of methamphetamine, (ii) approximately 430 grams of a mixture of methamphetamine and cocaine, (iii) a large quantity of marijuana, and (iv) narcotics distribution paraphernalia, including a hydraulic press used to package narcotics. (Opp. at 2.) Law enforcement also recovered four loaded firearms, three of which had defaced serial numbers. (See id.; see also PSR ¶ 28.) Defendant was in California at the time of the premises search. (Opp. at 2.) Defendant was arrested at his Astoria apartment in the early morning hours of October 25, 2019. (Id.) At the time of Defendant's arrest, law enforcement recovered his cellular phone. (PSR ¶ 28.)

Defendant served as Joiles's supplier for at least some of the purported Oxy 30s that Joiles sold. (Id. ¶ 23.) For example, on May 30, 2019, Joiles texted Defendant asking about purchasing 100 "blues," which refers to Oxy 30s' blue color. (Id.) On August 5, 2019, Defendant texted Joiles and told him that "I got the blues if u need em." (Id.) Defendant's cellular phone also shows

4

communications to other third parties at around the same time period during which Defendant attempts to sell large quantities of purported Oxy 30s for distribution. During the course of these messages, Defendant referred to the Oxy 30s as "blues," "smurfs" (another reference to the pills' blue color), and "roxy," a play on "Oxy." (Opp. at 3.)

Defendant was aware that both the "cocaine" and "Oxy 30s" he sold were potentially adulterated. On July 18, 2019, Joiles sent a message to Defendant, complaining that Defendant was "killing my relationships," and Joiles sent a screenshot of messages between Joiles and another person, in which that person complained about the quality of the "cocaine" that Joiles presumably received from Defendant. (Id. at 3-4.) On July 21, 2019, Joiles sent Defendant a screenshot of a message between Joiles and co-conspirator Rami Dewidar, who had distributed to the UC pills that were purportedy Oxy 30s but that actually contained fentanyl. (Id. at 4; PSR ¶ 30.) In this screenshot, Dewidar complains to Joiles that he had overpaid—$1,200—for "pressed," meaning pressed or adulterated Oxy 30 pills. (Opp. at 4; PSR ¶ 30.) Dewidar further stated that he "just can't have nothing fake or something happen to me or someone." (PSR ¶ 30.) In sending that screenshot to Defendant, Joiles wrote, "[y]our [sic] killing me bro." (Opp. at 4.) He then

5

sent an additional screenshot with messages complaining about the quality of purported cocaine. (Id.) In response, Defendant said:

> I don't fucking make the shit bro. I didn't touch it. But you can't please everyone. Some people like it some dont. Its whatever you want to do. I can't go without it and I can't control what is out there right now. If you want look around elsewhere bro go ahead.

(Id.)

Defendant's phone also contained evidence of his control of the guns and drugs seized from his apartment. When Defendant returned to his apartment, after it had been searched, Defendant believed he had been the victim of a robbery. The day following his return, October 19, 2019, Defendant communicated with a WhatsApp user identified as "Dr8." Defendant sent "Dr8" voice notes including, among others, the following excerpts:

> I'm fucking stressed the fuck out, man. . . . I'm having a fucking nightmare right now, my n\*\*\*a. I just wanna fucking blow some –blow somebody's – blow somebody's wig off, my n\*\*\*a. That's what I wanna do. N\*\*\*\*s didn't find – I had one joint they didn't find. I had that shit stashed. I had that shit stashed in the kitchen.
> [ . . . ]
> I ain't gonna front, man, I'm feeling better than yesterday, bro. I have this shit in my back pocket. I've been in the house, running around with this in my back pocket just in case anybody come back over here. I'ma take a n\*\*\*\*s head off.
> [ . . . ]
> . . . . N\*\*\*\*s caught four joints in total, man. Four joints in total, man. White boy had left his shit at my crib. They caught that shit. They caught my mozzy. They caught mad shit, n\*\*\*\*. Fucked my whole shit up. You have no idea. N\*\*\*\*s is nasty.
> [ . . . ]
> . . . . N\*\*\*\*s got me for fucking the problem solvers. I had two of them in the gaveta [drawer]. Got me for fucking 220 of B. Then I had a bullshit joint. Half a—

6

>  quarter of a joint. That shit wasn't even fucking real
> to be honest with you. That shit was like more cut than
> anything. Still they got that too. They got all the bud
> that I had loose in the kitchen. I had some loose shit
> in the kitchen. N****s did me dirty, my n***a.
>                       [ . . . ]
> I just had a feeling it was the popo. I just hope it's
> not the popo, n***a. Because if it's the popo, I'm
> fucked, n****. For real, I mean, if it's like some secret
> indictment shit, some crazy wild shit, n***a, I'm
> fucked. I don't think so though. That many hammers,
> n***a, the cops would've been here at my door already.

(Id. at 4-5.)

In these messages, Defendant tells "Dr8" about the guns that were seized ("four joints in total"; "my mozzy" [i.e., a Mossberg shotgun]; "problem solvers"; and "hammers"). He also states that he had a fifth gun, which was not recovered by law enforcement, which he was carrying and would use to shoot any robber who tried to return to his apartment. (Id. at 5.) He also discusses the drugs that were seized. (Id.)

B. Criminal History

On September 23, 1998, when Defendant was nineteen, he pleaded guilty to attempted robbery in the second degree. (PSR ¶¶ 57-60.) The robbery occurred in the early morning of June 4, 1997, in the Union Square area of Manhattan. (Id. ¶ 58.) Defendant brandished a firearm and robbed a victim. (Id.) For this offense, Defendant

initially received five years probation but was ultimately resentenced to 18 months to three years imprisonment. (Id. ¶ 59.)

On February 25, 2001, Defendant was arrested for dealing narcotics. (Id. ¶¶ 61-62.) He was sentenced to 18 months to three years incarceration, as part of the same sentence he received for his second-degree attempted robbery. (Id.)

In 2016, Defendant was convicted of trafficking marijuana in Pennsylvania. (Id. ¶¶ 63-68.) In connection with this arrest, law enforcement recovered a quantity of marijuana and approximately $17,000. (Id. ¶ 65.) Defendant was sentenced to between five and twenty-three months incarceration for this offense. (Id. ¶ 63.) He was on probation for this offense at the time of his arrest in the instant case.

C.  Procedural History

Defendant was presented on a criminal complaint on October 25, 2019, the day of his arrest. (See dkt. no. 4.) On November 13, 2019, a grand jury returned Indictment 19 Cr. 807, charging the defendant with one count of conspiring to commit narcotics trafficking, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) ("Count One"), and one count of possessing a firearm in connection with narcotics trafficking, in violation of 18 U.S.C. § 924(c) (See Dkt. No. 6.) On December 2, 2021, a grand jury returned Superseding Indictment S1 19 Cr. 807, which included an additional substantive narcotics distribution count against Defendant, in

8

violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(C). (See Dkt. No. 147 ¶¶ 9-10.)

On January 4, 2022, one week before jury selection was scheduled to begin, the Defendant pleaded guilty before the Court to Count One, for participating in a fentanyl, methamphetamine, and cocaine trafficking conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Pursuant to his plea agreement, Defendant was subject to a Guidelines range of 121 to 151 months imprisonment at sentencing with a mandatory minimum sentence of 120 months imprisonment. (PSR ¶ 8.) On April 28, 2022, the Court imposed a below-guidelines, mandatory minimum sentence of 120 months incarceration. (See Judgment, dkt. no. 190, at 2.)

Defendant is currently serving his sentence at FCI Danbury and is scheduled to be released on or about July 18, 2027.

D.  Defendant's Motion for Compassionate Release

On or about October 3, 2023, Defendant moved pro se for compassionate release. (See Mot.) Defendant asserts that his health conditions would be better served if he could be treated in a civilian hospital. (Id. at 3.) He also requests early release due to recent amendments to the United States Sentencing Guidelines that make retroactive the calculation of criminal history based on the "status points" sometimes applicable when a defendant has

9

committed a criminal offense while serving a term of probation or otherwise under a criminal justice sentence. (Id. at 4.)

As described above, the Government filed a letter opposing Defendant's motion on November 2, 2023, (see Opp.), in response to which Defendant filed a reply on December 20, 2023, (see dkt. no. 220).

II. Applicable Law

A. Section 3582

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the court "may not modify a term of imprisonment once it has been imposed," except that:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

Section 3582 only allows a defendant to seek compassionate release from a court, "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons

10

to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" Id. Failure to exhaust requires denial of a compassionate release motion. See, e.g., United States v. Demaria, No. 17 CR. 569 (ER), 2020 WL 1888910, at *4 (S.D.N.Y. Apr. 16, 2020).

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Until the Sentencing Commission amends the previously governing policy statement, the Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before" it. United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020). By statute, however, "[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason." Id. (citing 28 U.S.C. § 994(t)).

"[T]he existence vel non of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release—the existence of such reasons does not mandate release." United States v. Ebbers, 432 F. Supp. 3d 421, 430 (S.D.N.Y. 2020), abrogated on other grounds by Brooker, 976 F.3d at 236; see also United States v. Israel, No. 05 Cr. 1023 (CM), 2019 WL 6702522,

11

at \*11 (S.D.N.Y. Dec. 9, 2019) ("A court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition. . . . [Section 3582] was drafted using the word 'may,' not 'must.'"). The Court must also conclude that the Section 3553(a) factors warrant a sentencing reduction. See United States v. Keitt, 21 F.4th 67 (2d Cir. 2021) (concluding that a district court may deny a motion for compassionate release if the Section 3553(a) factors do not warrant a reduction without reaching the question of extraordinary and compelling reasons). Consideration of the relevant Section 3553(a) factors requires an assessment of whether they "outweigh the 'extraordinary and compelling reasons' warranting compassionate release . . . [and] whether compassionate release would undermine the goals of the original sentence." Ebbers, 432 F. Supp. 3d at 430-31; see also United States v. Lisi, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding "extraordinary and compelling reasons" warranting the defendant's release but nevertheless denying motion for compassionate release because Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [the defendant's] sentence").

As the proponent of this motion, Defendant bears the burden of proving both that "extraordinary and compelling reasons" exist and that the Section 3553(a) factors justify his early release. See United States v. Gotti, 433 F. Supp. 3d 613, 619 (S.D.N.Y.

2020) (defendant bears burden of showing existence of extraordinary and compelling reasons for sentence reduction); Ebbers, 432 F. Supp. 3d at 426–27 (defendant bears burden to establish elements entitling him to sentence reduction, including Section 3553(a) factors); see generally United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

    B.  Guideline Amendments

Effective November 1, 2023, the Sentencing Commission promulgated various amendments. One, Amendment 821, involves the calculation of "status points" used to determine a defendant's criminal history category for purposes of determining a sentence range. See U.S.S.G. § 4C1.1. Amendment 821 applies retroactively, making Defendant eligible for its application even though he was sentenced before it went into effect. See United States v. Batista, 2024 WL3522061, at *1 (S.D.N.Y. July 24, 2024) (noting retroactive application of Amendment 821).

Where the Guidelines range applicable to a defendant has been lowered as a result of an amendment, Section 3582(c)(2) permits the Court to reduce the sentence. See United States v. Olarewaju, 2024 WL 3084748, at *1 (S.D.N.Y. June 21, 2024). Section 3582(c)(2) "establishes a two-step inquiry. A court must first determine that a reduction is consistent with Section 1B1.10 [of

13

the Sentencing Guidelines] before it may consider whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a)." Dillon v. United States, 560 U.S. 817, 826 (2010).

Under application note 1(A) to Section 1B1.10: "Eligibility for consideration under 18 U.S.C. § 3582(c)(2) is triggered only by an amendment listed in subsection (d) that lowers the applicable guideline range (i.e., the guideline range that corresponds to the offense level and criminal history category determined pursuant to §1B1.1(a), which is determined before consideration of any departure provision in the Guidelines Manual or any variance)." U.S.S.G. cmt. application n.1(A).

The extent of the permissible reduction is strictly limited. Congress delegated to the Sentencing Commission the authority to determine to what extent a sentence may be reduced. See 18 U.S.C. § 3582(c)(2); 28 U.S.C. § 994(u); Dillon, 560 U.S. at 826 ("The SRA charges the Commission both with deciding whether to amend the Guidelines, § 994(o), and with determining whether and to what extent an amendment will be retroactive, § 994(u). A court's power under § 3582(c)(2) thus depends in the first instance on the Commission's decision not just to amend the Guidelines but to make the amendment retroactive. The court is also constrained by the Commission's statements dictating 'by what amount' the sentence of a prisoner serving a term of imprisonment affected by the amendment

'may be reduced.'"). "Subsection 1B1.10(b)(2)'s limitation on a district court's sentence-reduction authority is absolute." United States v. Jackson, 751 F.3d 707, 711 (6th Cir. 2014).

Guideline Section 1B1.10(b) directs that, with one exception (where the defendant earlier received a below-guideline sentence based on substantial assistance), "the court shall not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range" that the Guidelines would have provided at the applicable amendment been in effect at the time of sentencing.  U.S.S.G. § 1B1.10(b)(2)(A).  In other words, if the term of imprisonment the Court originally imposed was "within the guideline range applicable to the defendant at the time of sentencing, the court may reduce the defendant's term of imprisonment to a term that is no less than the minimum term of imprisonment provided by the amended guideline range[.]" Id. cmt. application n.3. Thus, the Court may not reduce the sentence below the amended range provided by the applicable amendment guideline, and "[i]n no case . . . shall the term of imprisonment be reduced below time served." Id.

III. Discussion

Defendant has failed to exhaust his administrative remedies; he has not demonstrated "extraordinary and compelling reasons" justifying his release; the Section 3553(a) factors weigh against

15

reducing the sentence originally imposed by this Court; and he is ineligible for a sentencing reduction pursuant to the retroactive Guidelines amendment. For these reasons, Defendant's motion is denied.

### A. Defendant Has Failed to Exhaust His Administrative Remedies

Defendant's motion says nothing about whether he has petitioned the Bureau of Prisons for early release, as required. According to Bureau of Prisons representatives, there is no record of Defendant's pursuing administrative relief. See Dkt. no. 215 at 9. Defendant argues in reply that the Warden could not "rule on such things as the Criminal History Amendment or Amendment 821. Thus proving it would be futile to ask the Warden to decide on something that he does not have the authority to decide on." (Dkt. no. 220 at 2.) Nevertheless, because Defendant failed to exhaust his administrative remedies, his motion is not ripe and is denied on that basis. See Demaria, 2020 WL 1888910, at *4.

### B. Extraordinary and Compelling Reasons

In support of his motion, Defendant cites two health conditions, a digestive issue and a thyroid issue, as reasons why he should be released. He argues that "he would be better served being treated in a 'real' hospital for his diseases." (Mot. at 2.) The conclusory statement that he might be better treated in a civilian setting certainly does not constitute extraordinary and

16

compelling circumstances warranting early release. Indeed, Defendant's medical records, filed under seal, demonstrate that he is receiving appropriate treatment for his conditions.

To the extent that Defendant argues that the retroactive "status points" Guideline Amendment constitutes "extraordinary and compelling reasons," he is incorrect. As set forth below, because he received the mandatory minimum sentence of 120 months incarceration, Defendant is ineligible for a sentencing reduction under the amendment.

C. Section 3553(a) Factors

Even assuming Defendant established extraordinary and compelling reasons warranting early release, the 3553(a) factors weigh against it. Needless to say, Defendant stands convicted of an exceedingly serious crime warranting an exceedingly serious punishment. As noted above, Defendant participated in trafficking of narcotics which he had reason to believe were adulterated. Tragically, his conduct resulted in the death of 29-year-old Rachel Spiteri.

In seeking early release, Defendant cites the education and counseling he has pursued since his incarceration, (See Mot. at 5; dkt. no. 220 at 3), and "appeal[s] to [the Court] for a second chance, not out of a sense of entitlement, but to prove that the

17

changes within me are genuine and enduring[,]" (dkt. no. 220 at 4). Ms. Spiteri's mother writes:

> Not only did [Defendant] sell drugs, but he knowingly sold counterfeit drugs containing fatal amount of fentanyl. My daughter will not get a second chance because of his actions. There will be no compassionate release for her.

(Opp. Ex. A [filed under seal].) The seriousness of Defendant's conduct of conviction far outweighs his post-conviction conduct.

With respect to Defendant's argument that "the sooner he is home, even if by a few months, the sooner he can . . . return to being a father to his four children," (Mot. at 2, dkt. no. 220 at 2), Rachel's mother responds,

> It is my understanding that his family can come and visit him in jail. The only thing I am able to visit is a black tombstone."

(See Opp. Ex. A [filed under seal].)  The seriousness of Defendant's crime and the damage it visited on Rachel and her family requires that Defendant serve the mandatory minimum ten-year sentence.

The seriousness of Defendant's crime is only increased by law enforcement's recovery of four firearms from Defendant's apartment, three of which has defaced serial numbers. In addition, Defendant claimed to a cohort that he had a fifth firearm and that he was prepared to "take a [person's] head off." (Opp. at 5.) Again, the mandatory minimum sentence is required in light of the

18

seriousness of Defendant's crime and to protect the public from further crimes on his part.

Given the uptick in fentanyl availability in recent years, the mandatory minimum 10-year sentence is also required to deter others who might be tempted to traffic in such drugs. Clearly the § 3553(a) factors counsel against a reduction in sentence.

D. Retroactive Guideline Amendment

It does appear that, if Defendant was eligible for resentencing, the Guidelines amendment would alter his criminal history category from III to II. This change would result in a potential Guidelines sentencing range of 108 to 135 months imprisonment, compared to the range of 121 to 151 months originally calculated under the Guidelines ahead of Defendant's 2022 sentencing, (see PSR at 29.) However, because Defendant was convicted for his involvement in a narcotics conspiracy in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), the ten-year mandatory minimum term establishes his guidelines range (even under a different criminal history category) at 120 to 135 months imprisonment. Because the Defendant's mandatory minimum remains the same, he received the mandatory minimum sentence, and the mandatory minimum sentence is at the bottom of an amended guidelines range, the Defendant is ineligible for a sentencing reduction pursuant to the amendment. See U.S.S.G. § 1B1.10(a)(1); see also id. cmt. application n.1 ("[A] reduction in the

defendant's term of imprisonment is not authorized under § 3582(c)(2) and is not consistent with this policy statement if . . . an amendment listed in subsection (d) is applicable to the defendant but the amendment does not have the effect of lowering the defendant's applicable guideline range because of the operation of another guideline or statutory provision (e.g., a statutory mandatory minimum term of imprisonment).") Accordingly, Defendant is ineligible for a sentencing reduction as a result of Amendment 821.

IV. Conclusion

For the foregoing reasons, Defendant's motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c) is denied.

The Clerk of the Court is respectfully directed to close docket entry number 213 and to mail a copy of this order to Defendant.

**SO ORDERED.**

Dated:   New York, New York
         October 3, 2024

_____
LORETTA A. PRESKA
Senior United States District Judge